STATE of Missouri, Respondent,

v.

Marvin C. JONES, Appellant.

No. 66697.

Supreme Court of Missouri,
En Banc.

Feb. 18, 1986.

Rehearing Denied March 25, 1986.

C.J. Larkin, Columbia, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

WELLIVER, Judge.

Appellant was convicted of capital murder, § 565.001, RSMo 1978 (repealed October 1, 1984, now first degree murder § 565.020, RSMo Cum.Supp.1984), and sentenced to death, and he was also convicted of armed criminal action, § 571.015.1, RSMo 1978, and sentenced to three years in the Missouri State Penitentiary. Original appellate jurisdiction vests in this Court. Mo. Const. art. V, § 3. We affirm.

The evidence presented at trial is not at issue on appeal. The victim, Dorothy Fienhold, was fifty-eight years old at the time of her death. Appellant, who was sixty-three at the time of the trial, had been involved in a stormy relationship with the victim during the couple of years preceding her death. Both appellant and the victim lived in Illinois. By August of 1983, the victim indicated a desire to end the relationship. On Saturday, August 20, appellant and his ex-wife, Iris Jones, observed the victim in the company of another man, and appellant became enraged with jealousy. At 9:00 a.m. the next morning, the victim received a telephone call from the appellant, and the victim's granddaughter overheard the victim exclaim that she was not going to go to Missouri with appellant. The victim told her granddaughter that she was afraid of the appellant. Dorothy Fienhold was not seen alive past 5:00 p.m. that day, August 21, 1983.

The following morning, August 22, Mr. Ousley noticed an abandoned car on his property near Interstate 44 here in Missouri. He watched the vehicle for a little under an hour, and then he went home and called the police. Officers arrived about ten minutes later, at 11:55 a.m. One of the investigating officers, Officer Wilhoit, looked inside the car and observed a "heap of clothes" and "what looked like a white cord that looped out from underneath the clothes that had what appeared to be speckled—blood specks on it." The vehicle was locked, but Wilhoit managed to open the door with a coat-hanger. On the floor mat, he noticed some drops of blood and called for additional assistance. An expanded search of the area turned up a bloody pair of pants and two bloody sheets lying in the brush some fifty to seventy-five feet from the car. He went back to the car and found the victim's purse, with her driver's license and some letters. Wilhoit also found a temporary Illinois registration for the vehicle in the name of appellant. While Wilhoit was searching the car, other officers at the scene located the victim's body in the brush off the side of the road in a wooded area. Officers also located military papers belonging to appellant near the scene of the murder. Two witnesses placed appellant near the scene of the crime.

When the victim's body was found, it was badly mutilated and the face was unrecognizable. Death was caused by two contact gunshot wounds at the point of each

eyeball, either one of which was fatal. The coroner testified that prior to her death, the victim was badly beaten and suffered a number of broken ribs. Although it was not the cause of her death, she also was manually strangled. There were other contusions and abrasions, which occurred after her death. Further testimony indicated that she had been killed closer to the road and then dragged into the woods.

Appellant raises four arguments on appeal. Initially, appellant asserts error in the manner in which the jury rendered its decision to impose the death sentence. During the punishment phase of the trial, the jury was instructed in Instruction No. 20 that it could impose a sentence of death only if it found one or more of the following aggravating circumstances:

1. Whether the defendant has a substantial history of serious assaultive convictions.
2. Whether the murder of Dorothy J. Fienhold involved torture or depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhuman.

Instruction No. 24 further provided that if the jury decided to impose the death sentence, it must write onto its verdict from the aggravating circumstance or circumstances submitted in Instruction No. 20 which it found beyond a reasonable doubt. The jury decided to impose the death sentence and returned the following verdict form, with the italicized portion representing the handwritten findings by the jury:

### VERDICT

JURORS: Use this form only if the punishment fixed by you is death. See Instruction No. 24 for directions as to what must be written into the verdict form if the death penalty is imposed. Use the reverse side of this form if necessary. The foreman's signature must appear at the end of the matter which you designate in writing as the aggravating circumstance or circumstances which all twelve jurors found beyond a reasonable doubt.

As to Count I, we, the jury, having found the defendant guilty of the capital murder of Dorothy J. Fienhold, fix the defendant's punishment at death, and we designate the following aggravating circumstance or circumstances which we find beyond a reasonable doubt:

1. *Physical torture of victim by strangulation of neck, broken ribs, various bruises and contusions to body previous to death.*
2. *Placement of weapon in contact with eye when fatal bullet was discharged.*
3. *Deliberate mutilation of victim by discharging an additional bullet into other eye.*

After determining that the form was not in exact compliance with the instructions, the trial judge resubmitted the case to the jury with directions to follow the instructions. Twenty minutes later the jury sent a note to the trial judge requesting "some clarification of Instructions # 24 and # 20 to proceed." The Judge replied in writing that "I can't instruct further." Shortly thereafter the jury returned its verdict form with the following changes:

As to Count I, we, the jury, having found the defendant guilty of the capital murder of Dorothy J. Fienhold, fix the defendant's punishment at death, and we designate the following aggravating circumstance or circumstances which we find beyond a reasonable doubt:

*Physical torture of victim by strangulation of neck, broken ribs, various bruises and contusions to body previous to death.*

*Placement of weapon in contact with eye when fatal bullet was discharged.*

*Deliberate mutilation of victim by discharging an additional bullet into other eye.*

2. *We the jury find that the murder of Dorthy [sic] Fienhold involved torture, was wantonly vile, and inhuman for the above reasons.*

Appellant contends that this second verdict is defective because it fails to track the language of the statute and Instruction No. 20, it contains non-statutory aggravating

circumstances and indicates some jury confusion.

█ This Court recognizes that the written findings by the jury did not track the language in Instruction No. 20. The jury was asked only to write the aggravating circumstance or circumstances which it found justifying the imposition of the death penalty. Instead, the verdict form as accepted by the trial judge included the jury's apparent reasons for finding that the murder involved torture and was wantonly vile and inhuman.[1] We do not agree with appellant's characterization of these first three handwritten lines as non-statutory aggravating circumstances; they are nothing more than the reasons the jury considered in finding the aggravating circumstance recited in the last handwritten line following the number "2," with the number "2" reflecting the aggravating circumstance submitted in Instruction No. 20. This Court was presented with a similar situation in *State v. Nave*, 694 S.W.2d 729 (Mo. banc 1985), where we found no error because the jury clearly expressed its intent in the verdict form and "sufficiently recited all of the essential elements of the statutory aggravating circumstances submitted." *State v. Nave, supra*, at 737. Explanatory language indicating the reasons for the jury's finding did not taint the verdict. The same holds true in the case at bar. It should be beyond dispute that the jury clearly intended to impose the death sentence and that it found the second aggravating circumstance submitted in Instruction No. 20. We, therefore, find no error in the verdict.

█ Ancillary to appellant's argument on this point is the claim that the reasons stated by the jury are insufficient to establish the jury's finding that the murder involved "torture." In its first handwritten line, reprinted above, the jury indicated some of the reasons why it found the mur-der involved torture. A review of the record indicates that there is sufficient evidence establishing multiple injuries to the body, including a number of broken ribs and an attempt to manually strangle the victim, all occurring prior to the two gunshot wounds to the eyes and other postmortem injuries. It is also likely, although surely not necessary, that the jury considered the gruesome mutilation of the body, whether occurring post or pre-morten, as indicative of appellant's state of mind and actions prior to the victim's death while she was being strangled and badly beaten. We cannot say that there is insufficient evidence establishing the jury's finding that the murder involved torture.

Next, appellant argues that certain statements made by appellant should have been suppressed because they were obtained after an illegal arrest. Officers at the scene of the murder found military papers with appellant's name and determined that the abandoned car alongside the road was registered to appellant in Illinois,[2] and they contacted officers in the Mt. Pulaski Police Department in Illinois. They explained the situation and indicated that they wanted appellant for questioning. Late that afternoon, on August 22, Illinois authorities conducted an inquiry and learned that appellant and the victim were acquaintances and that they had been seen together numerous times and had been last seen toward the end of that previous week. Appellant's ex-wife was also contacted. Between 9:00 p.m. and 9:30 p.m. that evening, appellant voluntarily arrived at one of the police departments in Illinois. At first, he was not placed under arrest. Appellant was informed that his vehicle had been found in Missouri, and appellant indicated that he had loaned the car to a friend. Another Illinois officer stayed with appellant while Officer Larry Ball contacted Missouri highway authorities. Sergeant Aytes, here in

---

1. In *State v. Lashley,* 667 S.W.2d 712 (Mo. banc 1984), this Court held that if a jury returns an improper verdict, the trial court must refuse to accept the verdict and require further deliberations until the jury returns a verdict in the proper form.

2. There is some dispute in the record concerning whether the officers knew that the vehicle was actually registered in both appellant's name and that of his ex-wife, Iris Jones.

Missouri, asked Ball to hold appellant for investigation of the homicide until Aytes could go to Illinois to question appellant. Appellant was then placed under arrest and read his *Miranda* rights and subsequently transported to the Logan County Safety Complex in Illinois. Officer Aytes, along with Sheriff Giles of Crawford County, Missouri, drove to the Logan County jail in Lincoln, Illinois. They arrived around 3:30 a.m. to 3:45 a.m., during the early morning on August 23rd. Appellant was again advised of his rights and volunteered a statement. Among other things, appellant stated that he did not "know anything about Dorothy being shot" before appellant was told that the victim had been shot. The interview lasted about an hour, and appellant was released around 10:00 a.m. that morning of August 23rd. A further investigation ensued and a Missouri arrest warrant was issued at 11:00 p.m. that night, on August 23rd.

Illinois held an extradition hearing on October 20, 1983, at which time appellant was ordered extradited. Officer Aytes and Sheriff Giles transported appellant from Illinois to Missouri. They advised appellant of his *Miranda* rights, and, while en route, appellant gave both a written and oral statement concerning the facts surrounding the victim's death. Appellant claimed that he was present during the shooting, but told the officers that he was wrestling with the victim and the gun went off.

 Appellant argues that two of his statements, the one on August 23rd, and the one on October 20th, should have been suppressed.[3] Appellant contends that these statements were obtained pursuant to an illegal arrest on August 22nd and therefore should have been excluded as the "fruit of a poisonous tree." The arrest is said to be illegal because the Illinois authorities failed to comply with Ill.Rev.Stat. ch. 60, § 31 (1971), the Illinois Uniform Extradition Act. This section is the same in substance as § 548.141, RSMo 1978, which authorizes an arrest without a war-

rant if there is "reasonable information" that the "accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding one year." Appellant contends that the Illinois authorities lacked any reasonable information that appellant had been charged with such an offense in Missouri. We do not believe that this statute has any bearing on this issue. Appellant had his right to an extradition hearing and he is not now challenging the propriety of the extradition order entered by an Illinois court. Rather, the question is whether Illinois authorities could detain and then arrest appellant on the night of August 22nd. When appellant voluntarily entered the Illinois police station, even without probable cause appellant could have been detained. *See United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). Appellant was then arrested in order to detain him for questioning. There was probable cause to believe that he had committed a crime and, therefore, supporting his arrest. *See generally Whitely v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *Ledesma v. State*, 251 Ga. 487, 306 S.E.2d 629 (1983); *Ostrowik v. State*, 665 P.2d 471 (Wyo.1983). A car registered in his name was found abandoned near the victim's body, and appellant's name was on papers found at the scene. Blood-stained pants belonging to a man were found near the scene of the murder and appellant and the victim were known acquaintances having a hostile love affair. Additionally, the statement made on October 20th, which was after appellant's extradition hearing, is so far attenuated from the arrest on August 22nd that it could not have been "tainted" by the events two months earlier.

 Third, appellant avers that the trial court improperly excused for cause a venireperson who unequivocally stated that she could not, under any circumstances, impose a death sentence during the punishment phase of the trial. Appellant argues that

---

**3.** The first statement was not introduced at trial.

**24**

this resulted in an improper death-qualification of the jury in violation of his rights under the United States Constitution, Mo. Const. art. I, § 5, and § 546.130, RSMo 1978. This same issue has been presented to this Court on a number of occasions, and we have held that a venireperson may be excused for cause if he or she indicates that they would not impose a death sentence under any circumstances. *See e.g., State v. Gilmore,* 697 S.W.2d 172, 175 (Mo. banc 1985); *State v. Nave,* 694 S.W.2d 729, 735–36 (Mo. banc 1985); *State v. Malone,* 694 S.W.2d 723, 726–27 (Mo. banc 1985); *State v. Kenley,* 693 S.W.2d 79, 82 (Mo. banc 1985); *State v. Johns,* 679 S.W.2d 253, 265 (Mo. banc 1984). We decline to overrule our prior cases and the point, therefore, is denied.

■ Appellant's last assignment of error is that his death sentence is excessive and disproportionate to the punishment imposed in similar cases. When the death penalty is imposed, it is this Court's statutorily mandated duty to review independently the sentence imposed by the jury. § 565.014, RSMo 1978 (repealed, now § 565.035, RSMo Cum.Supp.1984). There is no substantial evidence in the record to suggest that the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor. § 565.014.3(1). Nor do we find that the sentence in this case is excessive or disproportionate to other cases, considering both the crime and the defendant. *See e.g., State v. Battle,* 661 S.W.2d 487 (Mo. banc 1983); *State v. Smith,* 649 S.W.2d 417 (Mo. banc 1983); *State v. LaRette,* 648 S.W.2d 96 (Mo. banc 1983), *cert. denied,* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983).

The judgment is affirmed.

HIGGINS, C.J., BILLINGS, DONNELLY and RENDLEN, JJ., and SNYDER, Special Judge, concur.

BLACKMAR, J., concurs in part and dissents in part in separate opinion filed.

ROBERTSON, J., not sitting.

BLACKMAR, Judge, concurring in part and dissenting in part.

The statutes require us to compare death sentences in the interest of uniformity. It is not sufficient to hold that the jury's findings of guilt and of statutory aggravating circumstances are supported by the evidence. It is our duty to make an independent review of each case and to make diligent comparisons.

Most statutory aggravating circumstances are framed in terms of willfulness, deliberation, and hope of tangible benefit. The present offense appears to me to be a crime of passion. No motive appears. It is ironical that the Attorney General, who has often stressed the element of willfulness in some death sentence cases, now argues that the lack of motive in the present case is a circumstance to be considered.

The finding of "torture" is strained in the present case. It is based solely on the presence of antecedent violence. The record is sufficient to support a finding of capital murder, but the finding of torture borders on the speculative. I find little indication of pain inflicted for pain's sake.

The principal opinion cites *State v. Battle,* 661 S.W.2d 487 (Mo. banc 1983); *State v. Smith,* 649 S.W.2d 417 (Mo. banc 1983), and *State v. LaRette,* 648 S.W.2d 96 (Mo. banc 1983) as examples in deciding that the sentencing in this case was not excessive or disproportionate. *Battle* and *Smith,* along with *State v. Mercer,* 618 S.W.2d 1 (Mo. banc 1981), are easily distinguishable because the intent to kill the victim was clear before the murder took place. In *LaRette,* the intent of the defendant is less clear. However, it is easier to infer such an intent in *LaRette* than in the present case. In *LaRette,* there was no prior relationship between the parties that would explain the defendant's presence at the scene. In the present case, it is likely that the victim and defendant had gone off together and that an unplanned confrontation took place, even though she had expressed fear of him. She had previously driven off with him despite earlier statements that she feared him.

*Smith* is definitely distinguishable. In that case, the defendant had announced his intention to hurt the victim before the murder. He later admitted the murder, stating that he had wanted the victim to suffer. The murder was particularly brutal since the victim must have been alive and fearful throughout a long struggle. Smith chased the victim two and one-half blocks with an iron bar causing numerous injuries. These include: six head lacerations, multiple skull fractures, and contusions and abrasions of the brain. Indeed, the victim's skull was caved in.

In *LaRette*, the injuries similarly appear to be more aggravated than in the present case. There was evidently a struggle—blood was found throughout the apartment. Additionally, there were multiple stab wounds. The victim was stabbed in the lung and in the heart. A third knife wound cut across her throat, nearly decapitating her. The victim was alive throughout the ordeal, could see that she was bleeding, and clearly could anticipate her death. There was evidence of attempted sexual assault. There was also evidence that the defendant had earlier slowly circled the victim's apartment complex.

In *Battle*, an eighteen year old and his associate robbed and raped an eighty year old woman. Battle decided the woman had to die because she had seen them. He tried stabbing her with a butcher knife. The knife kept bending, so he stabbed her in the eye. When Battle left, the woman was still alive with the knife still stuck in her eye. She was saying prayers. She died later. The suffering involved is obvious.

*Mercer* is also distinguishable. There were not multiple wounds in *Mercer*. The woman was strangled. However, before her death, she was forced into a bedroom in Mercer's house and was raped by Mercer and some of his friends, in a scene of debauched brutality. She had time to fear

for her life. Mercer purposefully planned on killing the victim explaining to a friend that he should have killed an earlier rape victim (at the time of the murder, he was faced with rape charges from the earlier incident).

I do not believe that this case is comparable to others in which the death penalty has been decreed. There are numerous, more aggravated cases in which the jury has decreed life imprisonment.[1]

I would affirm the judgment of conviction but would remand for resentencing to life imprisonment with a mandatory sentence of fifty years.

1. *See, e.g., State v. Lawrence,* 700 S.W.2d 111 (Mo.App.1985) (Defendant and two others robbed an apartment looking for drugs. In that process, they shot two people to death and wounded another by shooting her four or five times.); *State v. Williams,* 678 S.W.2d 845 (Mo. App.1984) (victim killed by being beaten with bricks and being run over five times by a car). I will not encumber this opinion with other cases in which the reported opinions do not discuss details available to the Court's statutory assistant. *See* § 565.035.6, RSMo Supp.1984.